# EXHIBIT 1

1 Michael A. Bowse (SBN 189569)
mbowse@bowselawgroup.com
2 BOWSE LAW GROUP, A.P.C.
801 S. Figueroa St., 25th Floor
3 Los Angeles, CA 90017
Phone/Fax: (213) 344-4700
4

5 Dustin Huffine (SBN 300388)
dustin@huffinechung.com
6 HUFFINE CHUNG, A.P.C.
One World Trade Center, 8th Floor
7 Long Beach, CA 90831
Phone: (562) 676-4315
8 Fax: (213) 814-1448

9
Attorneys for Plaintiff Adam Perzow
10

11                SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                COUNTY OF LOS ANGELES, CENTRAL DISTRICT

13 ADAM PERZOW, an individual,          Case No. **18STCV04802**

14              Plaintiff,

15 vs.                                  **COMPLAINT FOR:**

16                                      **1) BREACH OF CONTRACT;**
                                        **2) BREACH OF FIDUCIARY DUTY; AND**
17 MOSHE HOGEG, an individual, and DOES 1- **3) FRAUD**
   20
18                                      **JURY TRIAL DEMANDED**
              Defendants
19

20

21

22

23

24

25

26

27

28

- 1 -
COMPLAINT

Plaintiff Adam Perzow ("Perzow" or "Plaintiff"), by and through his undersigned counsel, alleges as follows. Any allegations in this complaint that are contrary to or inconsistent with one another are made in the alternative.

**SUMMARY**

1.     This action concerns the breaches of contract and fraud Defendants committed so that they could secure for themselves the valuable www.invest.com domain name and the financial services business based upon it for a fraction of their actual value, while excluding Plaintiff and depriving him of his right to participate in that enterprise.

2.     Before Defendants became involved, Heath Global, Inc. owned the exclusive rights to purchase the www.invest.com domain. Plaintiff, as the president and sole shareholder of Heath Global, Inc., ultimately controlled that right to purchase and use the www.invest.com domain and, Defendants knew, therefore had sole authority to decide both the nature of and the participants in the business that would be built upon that domain name.

3.     Defendants recognized the value of the www.invest.com domain and wanted to acquire it. To do that, they needed Plaintiff's cooperation and consent. Defendants also wanted to spend less cash to acquire the domain than it was actually worth. That also required Plaintiff's cooperation and consent.

4.     Plaintiff, too, understood the value of the www.invest.com domain and intended to build a business based on it. Indeed, that is why he caused Heath Global to acquire the right to purchase the www.invest.com domain in the first place.

5.     In the end, Defendants and Plaintiff reached an agreement that, had Defendants not breached it, would seemingly have fulfilled all of these goals. Under that agreement, Plaintiff would cause Heath Global to sell to Defendants or one of their affiliates Heath Global's right to purchase the www.invest.com domain and, after Defendants exercised that purchase right, Defendants and Plaintiff, together and as joint venturers, would develop and operate a business utilizing the www.invest.com domain.

6.     Defendants, however, have not fulfilled their part of that bargain. Although

- 2 -
COMPLAINT

1  Plaintiff did everything he was required to do under the parties' agreement – he caused Heath
2  Global to sell its right to purchase the www.invest.com domain to Defendants and made
3  significant contributions to conceiving the business that would use that domain – Defendants did
4  not.  On the contrary, after they secured ownership of the www.invest.com domain, Defendants
5  merely strung Plaintiff along and ultimately cut Plaintiff out of the venture the parties had agreed
6  they would pursue together.

7       7.     Worse still, after Defendants cut Plaintiff out of the venture, the business they
8  ultimately launched using the www.invest.com domain was based on ideas Plaintiff provided in
9  pursuit of the intended joint venture, and differed substantially from Defendants' own initial
10  plan.  By using Plaintiff's ideas and concepts, as well as the www.invest.com domain,
11  Defendants were able to build a multimillion dollar business.  Had he not been cut out in breach
12  of the parties' agreement, Plaintiff would have reaped benefits worth tens of millions of dollars
13  or more today.

14       8.     Plaintiff filed this action to enforce his contractual and other rights and to recover
15  damages for the injuries he has suffered as a result of Defendants' breaches of those rights.

16                                                  **PARTIES**

17       9.     Plaintiff Adam Perzow is an individual who, at the time the parties made the
18  contract at issue in this action and throughout all times relevant to this action, was a resident of
19  California living in this judicial district.  As of the filing of this complaint, Plaintiff is not a
20  resident of the United States or any state therein.

21       10.     Defendant Moshe Hogeg ("Hogeg") is an individual currently residing in Israel.
22  In addition to the events and agreements alleged in this complaint, Hogeg has substantial
23  contacts with and interests in California.  Among other things, he has been an investor in and
24  advisor to numerous Internet and mobile smartphone app companies and business based in
25  California, including, for example, Yo, a Silicon Valley-based smartphone messaging app.

26       11.     Plaintiff is currently ignorant of the true names and capacities, whether
27  individual, corporate, associate, or otherwise, of the Defendants sued herein under the fictitious
28

- 3 -
COMPLAINT

1   names Does.  Plaintiff is currently ignorant of the true names and capacities, whether individual,

2   corporate, associate, or otherwise, of the Defendants sued herein under the fictitious names Does

3   1 through 10, inclusive, and therefore sues such Defendants by such fictitious names.  Plaintiff

4   will amend this complaint to allege the true names and capacities of said fictitiously named

5   Defendants when their true names and capacities have been ascertained.  Plaintiff is informed

6   and believes and thereon alleges that each of the fictitiously named Doe Defendants are legally

7   responsible in some manner for the events and occurrences alleged herein, and for the damages

8   suffered by Plaintiff and members of the class.

9        12.     Plaintiff is informed and believes, and on that basis alleges, that all Defendants,

10  including the fictitious Doe Defendants, were at all relevant times acting as actual agents,

11  captive agents or brokers, conspirators, ostensible agents, partners, brokers and/or joint

12  venturers, and employees of all other Defendants, and that all acts alleged herein occurred within

13  the course and scope of said agency, employment, partnership, joint venture, conspiracy and/or

14  enterprise, and with the express and/or implied permission, knowledge, consent, authorization,

15  and ratification of their co-defendants; however, this allegation is pleaded as an "alternative"

16  theory wherever not doing so would result in a contradiction with other allegations.

17                              **JURISDICTION AND VENUE**

18       13.     This Court has jurisdiction over the subject matter of this action because this is a

19  civil action wherein the matter in controversy, exclusive of interest and costs, exceeds the

20  jurisdictional minimum of this Court.  No federal subject matter jurisdiction over this action

21  exists because none of the parties is currently a resident of the United States.

22       14.     This Court has jurisdiction over Hogeg and each of the Doe defendants because

23  the exercise of jurisdiction over them is consistent with the constitutions of this state and of the

24  United States.  Each of the Defendants, either personally, or through their authorized agents,

25  purposefully availed themselves of the benefits of this state through intentional contacts with

26  this state.  Among other things, Defendants directed communications, including emails and

27  telephone calls, into this state for the purpose of negotiating and arranging the contract at issue

28

- 4 -
COMPLAINT

1 herein, met with Plaintiff in this State for the purpose of negotiating and making the contract at

2 issue herein and entered into the contract at issue in this action in this state. Plaintiff's claims in

3 this action arise out of those contacts by Defendants with this State. Moreover, at the time the

4 parties contracted, the www.invest.com domain name that is at the core of this action was held in

5 escrow in California. The exercise of jurisdiction over Defendants by this Court is reasonable

6 and consistent with notions of fair play and substantial justice because, *inter alia*, Defendants

7 regularly travel to or are present in California and can therefore conveniently appear in this

8 Court.

9      15.    Venue in this County is proper because the contract at issue in this action was

10 entered into within Los Angeles County.

11 **FACTS**

12      16.    With the intention of acquiring the www.invest.com domain name and turning it

13 into a major global business, Plaintiff caused his wholly owned company, Heath Global, Inc., to

14 acquire the exclusive right to purchase the www.invest.com domain.

15      17.    Heath Global purchased that exclusive right to acquire the www.invest.com

16 domain for $2 million, payable in installments over several years.

17      18.    Heath Global made several of the required payments under that purchase

18 agreement, but filed a voluntary petition for Chapter 11 bankruptcy before all of the payments

19 had been made.

20      19.    As part of the workout of the Chapter 11, and in an effort to retain its rights to

21 acquire the domain name, Perzow, on behalf of Heath Global, began negotiating with the seller

22 of the domain to restructure the purchase agreement. Simultaneously, he began seeking strategic

23 partners to help complete the acquisition and build out of the underlying business around the

24 Invest.com domain.

25      20.    During that search, Plaintiff identified and had discussions with multiple potential

26 strategic partners. Those discussions led to, among other things, opportunities to sell the

27 www.invest.com domain outright at prices between $4 million to $5 million. However, because

28

- 5 -
COMPLAINT

1    Plaintiff's intention was to be involved in the development, operation and profits of the business

2    built with the www.invest.com domain, Plaintiff ultimately chose not to pursue those offers.

3    Instead, he continued searching for strategic partners who would agree to pursue the

4    www.invest.com business jointly with him.

5          21.    During Plaintiff's search for strategic partners, Plaintiff was introduced to Gal

6    Ron ("Ron"), Chairman of the Board and CEO of WS Conversion Pros Holdings Limited

7    ("Conversion Pros"), a Cyprus-based financial-sector advisory firm. That introduction was

8    made by Ron's business partner, Michael Greenberg, who was CEO of Finance Magnates.

9          22.    Together, Ron and Plaintiff discussed how they intended to proceed.

10    Specifically, they discussed and reached an understanding that they intended to pursue the

11    www.invest.com business as a joint venture. Ron confirmed this understanding in an email, in

12    which he wrote that the potential joint venture transaction they were discussing would consist of

13    three participants each with an interest in the venture:

> From our end it was clear to be the following break down.
> - Domain - Adam
> - Knowledge/Knowhow/HR/Operations/Marketing/Sales - CONVERSION PROS
> - Investor – Funding

23.    Those talks, however, broke off amicably, in part because neither party had yet

identified a strategic investor that could finance the purchase of the www.invest.com domain and

also assist with the launch of the envisioned joint venture. A few months later, they would pick

up where they left off.

24.    Through the Chapter 11 process, Heath Global was able to reach an agreement

with the sellers from whom it had contracted to acquire the www.invest.com domain. That

agreement extended the deadline for the payments Heath Global was to make in connection with

the purchase in exchange for an increase of the total purchase price from $2 million to $2.5

million. Under the revised purchase agreement, upon payment of the entire $2.5 million

purchase price, the California-based escrow company holding the www.invest.com domain

would transfer the domain to Heath Global or any assignee of its choosing.

25.    Those modifications to the purchase agreement removed a number of

- 6 -
COMPLAINT

impediments to locating and reaching agreement with a strategic partner. As a result, Perzow became engaged in numerous discussions for different business venture opportunities concerning the domain name. At the same time, Perzow decided to explore the possibility of a strategic sale whereby he would sell the www.invest.com domain at a discounted cash price in exchange for receiving an equity or other ongoing interest in the resulting business.

26. Perzow sent a note to Ron to ask whether Conversion Pros remained interested in helping Heath Global sell or monetize the www.invest.com domain name. Perzow made clear that he would only entertain offers of at least $4 million, with the intention that this low price would result in a competitive bidding process among serious potential investors. Ron responded, expressing interest, but Perzow did not press the issue at that time as he was focused on other opportunities.

27. Subsequently, Ron contacted Perzow in Los Angeles, asking that he return the call as soon as possible, which Perzow did.

28. On the call, Ron suggested that they bring in defendant Hogeg, who he described as an Israeli venture capital investor who controlled a venture capital fund, a series of entities generally operating under the moniker "Singulariteam," to fund the purchase of the domain name and as a "trusted and ideal strategic partner" for the www.invest.com business. Ron made a number of representations about Hogeg and his involvement with Mobli, a competitor to Instagram which, according to Ron, had an "over one billion dollar valuation." Ron also told Perzow that Hogeg and Singulariteam had just completed a transaction for Pheed, a technology company based in the United States, in a part-stock and part-cash transaction. Ron explained that there was an opportunity for Perzow to partner together with Hogeg on the venture. Ron assured Perzow that Hogeg was highly-respected, could be trusted and could be a great partner for Perzow to put the www.invest.com domain to its biggest and best use.

29. Perzow expressed to Ron that the www.invest.com domain was worth more than $5 million and possibly on the order of $16 million. Similar premier financial services domain names had sold for such amounts, including www.insure.com, which sold for $16 million.

- 7 -
COMPLAINT

1  Perzow told Ron that, if Hogeg wanted to become involved in the www.invest.com domain, he

2  would have to move quickly and also recognize the brand's true value as the premier financial

3  services domain and brand in the world.

4      30.    Acting as the agent of Hogeg and Hogeg's investment fund, Ron introduced

5  Perzow to Hogeg.

6      31.    Ron, on behalf of Hogeg and Hogeg's fund, informed Perzow that Hogeg

7  preferred not to purchase the www.invest.com domain outright for a cash price that reflected its

8  true value, but instead wanted to enter into a broader agreement with Perzow to build the

9  Invest.com business in a joint venture similar to what Perzow and Ron had discussed previously

10 and Ron had described in his prior email to Perzow.  In other words, rather than sell the

11 www.invest.com domain for an all-cash price at full value, Perzow would partner with Hogeg

12 and be part of the venture.

13     32.    Hogeg was aware of Perzow's and Ron's previous discussions and the nature of

14 the joint venture structure they had discussed.  Indeed, Ron's earlier email outlining the joint

15 venture arrangement Ron and Perzow had discussed was forwarded to Hogeg, and Hogeg

16 subsequently forwarded that email to others.

17     33.    Thereafter, Hogeg, Perzow (in California) and others spoke by telephone.  Hogeg

18 reiterated what Ron had told Perzow previously.  Rather than purchase the www.invest.com

19 domain outright for an all-cash price at full value, he would pay substantially less than the

20 domain's full value in cash and, in exchange, Perzow would participate in and have an equity

21 interest in the intended business venture.  Discussion about this proposed joint venture ensued.

22     34.    Perzow provided Hogeg with detailed information about the basis for the price he

23 believed the domain name should sell for, including a valuation of the www.invest.com domain

24 that had been commissioned approximately two years earlier, information about the $16 million

25 sale price of www.insure.com and information about a more recent purchase of

26 www.insurance.com for $36 million.

27     35.    Perzow and Hogeg agreed that www.invest.com was most comparable and had

28

- 8 -

COMPLAINT

1  similar attributes to www.insure.com due to the domains both being short (6 letters), both being

2  category-leading financial service brands, and both being action verbs (prompting consumer call

3  to action). Perzow also expressed that this was the price or valuation of the domain name at that

4  time, that time was of the essence to close a deal, and that he would have to go in another

5  direction with regard to the domain name if something could not be agreed on promptly.

6      36.    Although Hogeg claimed he had big ideas for the www.invest.com brand, those

7  ideas were limited to foreign currency exchange. He was open, however, to bifurcating the

8  business by having a US based division contemporaneously with an international forex business,

9  which could operate another line of financial services. Hogeg also expressed that he was not

10  prepared to lose the opportunity to become involved with www.invest.com, expressing during

11  the call that the domain name would "unlock the value" for a multi-billion dollar deal, providing

12  immediate global leadership recognition to the joint venture as a financial services leader, instill

13  confidence with investors all over the world, and attract retail and major institutional investors

14  into the deal itself.

15      37.    During the call, Hogeg also bragged about Mobli, his previous venture which had

16  reached a valuation of over one billion dollars, and his recent acquisition of Pheed for a $40

17  million cash/stock transaction. Hogeg represented to Perzow that the Pheed founders made

18  "tens of millions" in that deal. Hogeg professed that the Invest.com project would be worth in

19  the billions, more even than Mobli's then-current over $1 billion dollar valuation, and

20  represented that Perzow would make much more money by partnering with Hogeg than with

21  other options for the domain name. Perzow was impressed and agreed that working with Hogeg

22  was a great opportunity in light of Hogeg's claim that he had turned Mobli into a billion dollar

23  plus business starting from nothing. (Unbeknownst to Perzow, Mobli was not in the condition

24  Hogeg professed, and would soon falter and become almost worthless).

25      38.    Without reaching final agreement the exact value of the www.invest.com domain,

26  Hogeg and Perzow agreed that the domain had a value of at least $5 million and as much as $16

27  million, and agreed to a two-part deal: (i) one of the companies in Hogeg's fund, Singulariteam,

28

- 9 -
COMPLAINT

1    Ltd., would pay the $2.5 million necessary to acquire the www.invest.com domain under Heath

2    Global's contract with the sellers from whom Heath Global had agreed to purchase the domain

3    and would also pay additional, relatively small amounts for other services, and (ii) Perzow

4    would participate in the subsequent www.invest.com business as a joint venture partner with an

5    ownership interest and a role in management of the new Invest.com business enterprise.

6        39.     As to the first component, Perzow would agree to assign Heath Global's rights to

7    the domain to Hogeg or his fund. Hogeg's fund would contribute the capital necessary for the

8    venture to complete the purchase of the www.invest.com domain from sellers with whom Heath

9    Global had contracted ($2.5 million) and would also pay some additional amounts necessary to

10    satisfy certain related debts and pay for certain related services. The total cash outlay would be

11    $3.15 million. The parties agreed, however, that substantially less than the domain was worth

12    even as a stand-alone asset

13        40.     As to the second component, Perzow would be awarded an ownership stake and

14    management role in the future www.invest.com business enterprise commensurate with the

15    value he was causing to be contributed to the venture. The value of Perzow's contribution

16    would be agreed upon in good faith between the parties at a later date using the $5 million to

17    $16 million valuation range that had been discussed previously.

18        41.     During a lengthy follow-up telephone call to that initial conference call, Perzow

19    and Hogeg reconfirmed the elements of the overall two-component deal. They reaffirmed that

20    Perzow was contributing the domain name rights to the venture at a reduced cash price, that

21    Hogeg or his fund was contributing capital, and that Perzow would receive an ownership stake

22    and management role in the future Invest.com venture (based on the agreed upon value of the

23    domain and Perzow's contribution).

24        42.     Thereafter, Perzow wrote to Hogeg, telling him that, while Perzow had

25    reservations about the small size of Hogeg's capital contribution, he would honor the deal

26    because Hogeg had agreed to compensate Perzow with ownership and management of the future

27    business:

28          "Nonetheless, I will do the deal with you at $3.15 mm and the reason is

because I see a big opportunity to be involved with you. I believe there is a massive upside to this global brand.

So I will sign our deal at $3.15 mm, but I want us to have an understanding that we will plan to meet next week regarding <u>my future involvement</u> (we can meet in LA OR NYC, whichever you prefer).

Anyway, please let me know your schedule so we can coordinate meeting for dinner."

43.     Hogeg responded "Tuesday in LA," confirming the agreement regarding Perzow's future involvement in the new business enterprise and in regard to their overall two-component deal they had already agreed to.

44.     Perzow subsequently wrote to Hogeg again shortly before the parties signed the paperwork for the transfer of the www.invest.com domain name. Perzow again stated unequivocally that the parties' arrangement involved the two components to which they had previously agreed:

"Moshe - Quick update, It seems we are almost done with the closing paperwork for the asset sale component of the deal.

In light of the asset sale closing today as well as our discussion to build something of magnitude in tandem, I will be officially notifying all the other groups / investors that Invest.com is officially off the market as of today."

45.     The structure of the arrangement Perzow and Hogeg agreed upon is unmistakable. Had Hogeg had any issue whatsoever with Perzow's characterization, there were multiple opportunities over the following several days for him to say so.

46.     But Hogeg neither objected nor corrected Perzow because Perzow's emails accurately referenced the agreement that had been made.

47.     Thereafter, one of the entities affiliated with Hogeg's fund, Singulariteam, Ltd., and Perzow (on behalf of Heath Global and himself personally) signed an Asset Purchase Agreement ("APA"), memorializing the first component of the two-component agreement. Namely, that APA specified the terms and arrangements for paying the sellers of the www.invest.com domain the $2.5 million purchase price and transferring the domain name into Singulariteam, Ltd..

48.     After Hogeg, through his fund, gained control over the www.invest.com domain,

- 11 -
COMPLAINT

1    Perzow grew concerned that Hogeg might not honor the rest of the parties' agreement.

2       49.     Perzow learned that Singulariteam's Chairman (as Hogeg often described him

3    publicly) was former Israeli Prime Minister Ehud Olmert, who was under indictment for bribery,

4    fraud, breach of trust and obstruction of justice (Olmert was subsequently sent to prison).

5    Perzow also learned that Singulariteam's then CEO, Adi Yehuda Sheleg, was involved in a

6    major fraud case of his own relating to Nochi Dankner, an Israeli businessman who was

7    convicted of a multi-billion dollar stock manipulation scam relating to IDB Holdings.  Sheleg

8    was accused of aiding and abetting Mr. Dankner and helping facilitate the stock price

9    manipulation fraud and was allegedly complicit with Dankner as a financial advisor.

10      50.     Separately, Hogeg's agent, Ron, began complaining to Perzow that he was

11   entitled to a commission (despite his being an agent of and fully compensated by Hogeg or

12   Hogeg's fund), and also mischaracterizing the nature of the Perzow-Hogeg two-component deal.

13   Perzow promptly corrected Ron's misstatements.

14      51.     First, Perzow wrote to Ron:

15          "I only agreed to sell the domain to Moishe's group not for the price of the
       domain, but because I can be involved with a strong group after the sale. When
16      you guys approached me last weekend, I had a variety of interested groups as well
       as buyers who were all interested in the domain. All of them we're very attractive
17      paths (including one path that wanted to take the Invest.com public) I should also
       mention that none of those directions involved a broker. We only wanted a broker
18      if we could get a sale of at least $ 4 million and if we were going to hire a domain
       broker we also needed to get court approval ahead of time for something like this.
19
            In the end, my decision to move this forward with Moshe was based
20      primarily on the fact that I can have an opportunity to be involved in the upside of
       Invest.com. I believe in what they bring to the table in terms of capital, reputation,
21      experience and ability (as well as your company's involvement on the marketing
       end). Therefore I know there is a big upside and bright future ahead, hence why I
22      declined all my other options in favor of this path. The price for the domain was
       NOT the main reason I did this deal, and that's why Moishe and I are planning to
23      meet on Tuesday evening here in Los Angeles regarding the future business."

24      52.     Thereafter, Perzow wrote to both Ron and Hogeg:

25          "My goal has always been to build [the www.invest.com domain], or
       partner with a group on it and build something big. I have had the domain since
26      2011 and have turned down offers of $5 million. Recently, I have also been
       dealing with a very impressive group out of New York who wanted to take
27      Invest.com public right away and has a lot of experience with public company's.
       Another major media group out of LA wanted to partner with me and create a TV
28      show based on crowdfunding. I was about to do a deal with another group when

                                    - 12 -

you and Moshe called me last Sunday out of nowhere. this all happened very quickly and I was about to go in another direction. You caught me at the last possible minute. These other deals were very attractive too and would have made me a lot of money (perhaps tens of millions over the long term).

Since you guys approached me last Sunday, I did more research on Moshe's group and realized there was a big opportunity and I was highly impressed with what they have done in the past. So I told Moshe that even though I had other options with the domain, that If we could come to a mutual agreement with him for my future involvement with the business, then I would sign with him for 3.15 mm. He agreed......so I signed the deal (and they got an amazing price on this domain). We also set up a plan to meet tomorrow night in LA (Tuesday).

With that said, If you don't mind I would like to sit down with Moshe tomorrow night as we have planned, and then we can speak on a call on Wednesday. I think that will be better. I want to know more about everything.

This week has been crazy for me so I apologize if I have been hard to reach. I have been dealing with Moshe's group and his lawyers as well as speaking with my other opportunities for Invest.com right up until this weekend. I haven't had much sleep, so I ask that we can speak on Wednesday so everyone is on the same page and is clear after I speak with Moshe."

53.     Hogeg responded to Perzow, writing, in pertinent part "I don't know you, I wanna meet you and explore possible venues but it's not a condition to the deal in any way.  We will get to know each other and see if we can enjoy each other."

54.     This email was of great concern to Perzow, as it sounded as if Hogeg was backtracking and pretending as if the parties' agreement did not include the second component that had been agreed upon, and that he was free to move forward with use of the domain name without any further obligation to Perzow.  Perzow decided that he needed to clarify any misunderstanding at their upcoming meeting in Los Angeles.

55.     During their in-person meeting in Los Angeles shortly after this exchange, Perzow told Hogeg that if he did not intend to honor his obligations to Perzow, namely that Perzow would receive an ownership interest and management role in the Invest.com business, it was still possible to unwind the deal and return the domain name to Perzow because the transaction had not yet been fully consummated and could still be unwound somewhat easily.

56.     Also at that meeting in Los Angeles, Perzow reminded Hogeg of the billion-dollar opportunity they had to use the best domain in the world relating to online consumer financial services, that together they could build the Invest.com brand into a massive success,

COMPLAINT

1   and that they should resolve and clarify any lingering issues so that they could move forward by

2   coming to a clear understanding about the deal.

3       57.   Perzow insisted that Hogeg either unambiguously commit to the two-component

4   deal or tell Perzow then and there that there had been some kind of mistake or misunderstanding

5   between the parties.  Hogeg agreed to everything that Perzow said, confirmed that he did not

6   want to unwind the deal and stated that they had a clear understanding for the two-component

7   deal.

8       58.   Hogeg agreed unconditionally that Perzow had indeed allowed Hogeg and his

9   fund to acquire the www.invest.com domain for the express and sole purpose of their joint

10  venture.  He also stated that he wanted to proceed with the arrangement, including with pursuing

11  the www.invest.com venture together with Perzow and in which Perzow would receive an

12  ownership stake and management role commensurate with the value he was causing to be

13  contributed to the venture, which value would be agreed upon in good faith between the parties

14  at a later date using the $5 million to $16 million valuation range that had been discussed

15  previously.

16      59.   After Hogeg confirmed his commitment to the parties' agreement, Perzow

17  explained his vision and business plan for the www.invest.com domain and informed Hogeg that

18  he believed the better path for the business was to go in the direction of a "Robo-Advisory"

19  business, including portfolio management for retail investors, which he believed would be a

20  billion dollar opportunity.  Perzow explained that this would be the biggest and best use of the

21  flagship www.invest.com domain and brand.  Perzow also explained that he believed the

22  direction that Defendants wanted to go (a foreign exchange ("forex") service) was a mistake.  He

23  explained that such use of the domain would be the wrong messaging and branding, and that it

24  would ultimately tarnish the premium brand of the www.invest.com domain due to the

25  reputation of forex as a gambling-like financial product that was highly speculative and frowned

26  upon by the credible investment community.

27      60.   Finally, during that Los Angeles meeting, having confirmed their mutual

28

- 14 -
COMPLAINT

1   agreement and understanding, the parties also agreed to meet again in Israel so that Perzow

2   could explain and deliver his ideas about the business model and marketing to the entire team as

3   well as finalize specifics on Perzow's deal for the venture.

4     61. Following the meeting, in an effort to document where things stood and what had

5   been discussed and agreed upon in language that was positive and cooperative, rather than

6   accusatory or too formal, Perzow wrote to Hogeg:

7      "Before I signed the agreement with you, I believe I made sure that we
  were in agreement that we would figure something out for my future involvement
8     with the company. So i thought we had an understanding and a level of trust
  (even though we had never met in person yet). After being introduced to you by
9     Gal, I recognized quickly that you had a big vision and the ability to make
  something happen. So i decided to sign the deal. Gal had also told me that there
10     was an opportunity for me to be involved in the business. This is how he sold me
  on you. I don't want to make this complicated because i think we are on the same
11     page in terms of our energy. I really enjoyed meeting you last night and I think
  we can work very well together. I also think I can bring the business a lot of
12     value (I also think we can do many other business things together aside from
  invest.com but that is another discussion for later). So instead of focusing on
13     what was discussed between us before I signed the contract with you, and whether
  or not my involvement was a condition for me singing the contract, I think its just
14     easier for us to discuss a role for me in the business. We are both smart,
  motivated guys and honorable people. I'm sure you also recognize the value of
15     the brand is much more than $3.15 million.....I sold it to you cheap because I
  recognized the bigger opportunity. The brand is worth tens of millions in reality,
16     and the only reason I didn't partner with another group is because i sensed the
  opportunity with you. The only issue was that we didn't have a lot of time so i
17     couldn't spend the time to get to know you first. So i took a chance (That is also
  why I asked that we come to an agreement for my involvement in the company
18     before I signed). Basically, I trusted you !....."

19     62. Perzow had now reiterated the understanding arrived at between him and Hogeg

20   during the meeting in Los Angeles by stating that, rather than "making things complicated" (*i.e.*

21   fighting about the meaning of the deal through legal process or unwinding the deal altogether),

22   the next step would be to continue with the arrangement agreed upon by mutually deciding in

23   good faith the fair value of Perzow's contribution to the venture.

24     63. Thereafter, Perzow began furnishing Hogeg with the reasons a robo-advisory

25   business was the superior business in order to shift Hogeg's thinking away from the speculative

26   and ill-reputed forex model. Later, Perzow would convey more detailed and various confidential

27   and novel business ideas about the business model for Invest.com to Hogeg and others at

28

Hogeg's fund.  Chief among these ideas was (a) Perzow's determination, and detailed analysis supporting that determination, that Invest.com should be used to build a "robo-advisory" business, which would include asset management/portfolio management, utilizing alternative investment products and custom portfolios, rather than a forex business, as Hogeg had been intending; and (b) Perzow's insistence that any marketing and branding lead with the concept of the domain being used to exemplify pure "simplicity", ease of use, trust for the masses which Perzow demonstrated to through detailed explanations of his due diligence and exemplar materials that he prepared and shared with Defendants.

64.    In the weeks that followed, news articles discussed the acquisition of the www.invest.com domain by Hogeg's fund.  Based on information provided or approved by Hogeg or his agent, Ron, those articles described the deal as an over $5 million domain name sale.  That, of course, was consistent with the parties' agreement that Perzow's stake in the venture would be determined based on a valuation of the www.invest.com domain between more than $5 million and $16 million.  *Finance Magnates* published an article entitled "Exclusive: Over $5 Million Paid for Invest.com by Israeli VC to Enter the Forex Business."  *GeekTime* published a similar article.  Furthermore, the *Forex Magnates* article properly articulated that Hogeg spearheaded the deal, and that they had "invested" over $5 million to acquire the domain which properly articulated the exact nature of the deal as dual part cash part "equity" concept.

65.    Thereafter, Perzow began communicating with Hogeg on Facebook.  First, Perzow asked Hogeg to confirm his receipt of the email Perzow wrote following their meeting in Los Angeles.  Hogeg confirmed receiving the email without challenge.  Perzow also asked when Hogeg wished to have Perzow come to Israel to continue working on the development of the Invest.com business they had agreed to pursue together.

66.    In the course of that Facebook exchange, Perzow continued recommending and pushing his ideas for the business model that Invest.com should adopt, by indicating the need for the parties to switch courses from the Forex concept and pointing out other successful leading businesses in the robo-advisory and portfolio management space (Betterment and Wealthfront).

Notably, as discussed below, Defendants ultimately did in fact co-opt this idea in its entirety for the Invest.com business, without any compensation to Perzow.

67.    Hearing nothing from Hogeg in response to those communications, Perzow wrote to Hogeg again, stating "Hey man, Still haven't heard back from you re: our understanding and meeting in Israel. Also didn't hear from you about the PR you put out. Hope all is well."

68.    Hogeg responded about scheduling: "Hi, I didn't put any PR, they just wrote what they think, I didn't respond to it. Wanna come to Israel in the 23"?". Perzow confirmed that the date suggested by Hogeg worked for Perzow to travel to Israel to continue the parties' implementation of their agreement. In a subsequent exchange, Hogeg confirmed to Perzow "Hi, Yeah, you should definitely come here". Once again, Perzow was gratified that there were no issues with the deal.

69.    Perzow travelled to Israel as arranged. While Perzow was in Israel, Hogeg provided Perzow with a car and driver, a mobile phone to use, meals, coordination of Perzow's schedule utilizing the office administration assistant to set him up on meetings amongst themselves (Hogeg) and various third parties associated with the venture, and also took care of all of Perzow's hotel bills.

70.    Upon Perzow's confirmation that he arrived in Israel, Hogeg messaged Perzow on Facebook informing him "are you busy tomorrow? Please keep Tuesday open". Perzow confirmed he would be available, and the series of meetings in Israel ensued.

71.    Over the course of his multi-week trip to Israel, Perzow met in person six times with Hogeg, Hogeg's team and affiliated parties. During these meetings, after further in-person confirmation that Perzow was a partner in the venture, Perzow continued explaining his confidential and novel ideas for the Invest.com business and tried to convince the group involved in the discussions in Israel to move away from the forex model.

72.    At the very first of these meetings, Perzow was introduced as a "partner" in the Invest.com business to the rest of the team by Hogeg, which included Sheleg, Micky Sapir and his partner Uri from IntelAgent, as well as a few other Singulariteam executives. A few days

COMPLAINT

later, Perzow was introduced to Ophir Gertner and Udi Cohen and Perzow was also confirmed to be a partner in the business to them as well.

73.     Perzow later would meet again one-on-one with Gertner to discuss Invest.com. Throughout the meetings in Israel Perzow and Hogeg discussed the structure of Perzow's future stake in the Invest.com business and his role in the enterprise.  Perzow shared ideas about the robo-advisory business and portfolio management in general with the team (with which neither Hogeg nor Gertner were very familiar, particularly because Gertner had come from the forex industry and Hogeg did not know about this space in general), as well as to ultimately turn Invest.com into a multi-division service brand once it established trust in the robo-advisory and portfolio management space – meaning it could create other lines of services once establishing itself.  Perzow helped to explain the path forward, and also mentioned he wanted to bring Steven Perlstein to the table (as part of Perzow's contribution toward the venture) to help with the overall effort to push Invest.com forward on the path Perzow had recommended.

74.     Hogeg and other parties expressed their enthusiasm about meeting with Perlstein and the new robo-advisory direction Invest.com was to be taken in.  They also expressed interest in Perzow's idea to ultimately incorporate a number of additional services and product lines once Invest.com demonstrated its category leadership in portfolio management and robo-advisory.

75.     Perzow met several more times with Hogeg while Perzow was in Israel.  During those meetings, Perzow and Hogeg discussed their excitement about Invest.com and the huge opportunity in front of them.  They also discussed the structure of Perzow's future stake in the Invest.com business, including that he would head U.S. operations for the Invest.com business enterprise that would offer financial services different from those offered internationally and would run all business development for Invest.com.  Hogeg also expressed that he was now convinced that Perzow's plan for the business was the right one.

76.     When Perzow returned to Los Angeles from Israel, he felt secure in the knowledge that Hogeg was committed to honoring their agreement and was serious about

- 18 -
COMPLAINT

adopting Perzow's idea to shift course for the business away from Forex, and toward robo-advisory. To that end, Perzow even formed a United States entity to house the U.S. operation he was to run. As it turned out, Perzow was only half right.

77.     In the months that followed, Perzow had difficulty communicating with Hogeg, Hogeg's fund or the fund's principals. Perzow called Hogeg numerous times, but Hogeg did not answer Perzow's calls or respond to them until, finally, after several months of unanswered calls, Hogeg told Perzow that things were moving slowly with the new business enterprise, because they were switching courses from Hogeg's forex model to Perzow's robo-advisory model and alternative asset management concept, and that they needed more time before they could integrate Perzow into the business.

78.     Perzow waited patiently, as he did not see any reason for major concern. Perzow knew that the team was, in fact, working diligently on developing the Invest.com business and had not yet launched the web site and business.

79.     As the months passed, however, Perzow grew concerned. He reached out to Hogeg, but was met first with feigned ignorance ("What can I help you with?") and then with outright denials of the parties' agreement.

80.     When Perzow wrote to Hogeg, saying "you are a very hard man to reach…are you cutting me out of the deal?", Hogeg responded:

"As you know I am a very busy man and sometimes, with no intention, hard to reach.

I was very surprised by your e- mail and don't understand the basis for your questions. Following the closing of the domain acquisition, we met a few times and discussed a potential cooperation, however we never agreed on such cooperation and it in fact didn't happen. I was not aware that you moved to Israel or even that you had plans to do so. We never discussed it and it is certainly not something that I suggested or encouraged in any way. However I would be happy to discuss future cooperation."

81.     Perzow was shocked. He responded:

"As was made clear between us on several calls and specific notice via email (s) prior to entering into the deal, the premise for entering into the domain sale component of the overall deal, and reducing the price of the domain from the asking price to the price that we contracted for, was the explicit understanding and representation(s) that the delta in price would be translated into a deal for myself with Invest.com.

- 19 -
COMPLAINT

<u>Without this assurance there would have been no deal</u> and I made sure we were clear prior because I didn't want any issues to arise (whereby you turned your back on me after you controlled the domain).

I hope you understand why I'm upset. I genuinely went into this with high hopes but I feel <u>I was deceived and taken advantage if</u>....and also wasted energy and time when I could have gone in another direction from the start."

82.    Perzow attempted to contact Hogeg several more times thereafter and even asked Hogeg to provide the contact information for his legal counsel so the matter could be resolved. But Hogeg ignored Perzow and stopped responding to Perzow altogether.

83.    Shortly after these last communications, Defendants launched the new Invest.com without fulfilling their obligations to Perzow.  They did not honor their agreement that Perzow would hold an equity stake in the business and also breached their agreement that Perzow would be included in the business' management.

84.    The new Invest.com bore all of the hallmarks of the valuable, confidential and novel business ideas that Perzow had shared with Defendants.  It was and continues to be a robo-advisory service using alternative investments, rather than Hogeg's original forex concept, and its branding used and continues to employ Perzow's "simplicity" concepts prominently and pervasively.  The Invest.com group has even branched out to offer related products, taking advantage of the good will of the Invest.com brand in those other lines of service (as Perzow had also recommended and described as his strategy).

85.    After years of protecting the www.invest.com domain and working to position the domain so it could achieve maximum value, Perzow's dreams for Invest.com had become a nightmare.  Defendants had excluded him from the venture, procured the domain through a pattern of wrongful and fraudulent conduct and used Perzow's business plans without his consent.

86.    As a result of this misconduct and these breaches of contract by Defendants, Plaintiff has been damaged in an amount to be proved at trial but which Plaintiff estimates to be tens of millions of dollars or more.

- 20 -
COMPLAINT

## FIRST CAUSE OF ACTION

### (Breach of Contract)

(Against Hogeg and Doe Defendants 1 through 10)

87.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

88.     A valid and enforceable contract, the terms of which are alleged above, existed between, on the one hand, Plaintiff and, on the other hand, Hogeg and Doe defendants 1 through 10.

89.     At the time the contract was made, Hogeg was acting on his own behalf and for his own benefit, as well as on behalf of and for the benefit of Doe defendants 1 through 10, with their express, implied or apparent authorization.

90.     Plaintiff fully performed all of his material obligations under the parties' contract, except to the extent his performance was prevented by the Defendants' conduct.

91.     Hogeg and Doe defendants 1 through 10, through the conduct alleged above, failed to perform their obligations under the parties' agreement.

92.     Defendants' breaches of the parties' agreement alleged herein caused Plaintiff to suffer damages in an amount to be proved at trial.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duties)

(Against All Defendants)

93.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

94.     By their agreements alleged above, the parties agreed to form and did form a joint venture to pursue the Invest.com business using the www.invest.com domain and were joint venturers with one another.

95.     As joint venturers to Perzow, Hogeg and Doe defendants 1 through 10 owed fiduciary duties of good faith, fairness, honesty and loyalty to Perzow.

- 21 -

COMPLAINT

96.     Hogeg and Doe defendants 1 through 10 breached those fiduciary duties by the conduct alleged in this complaint.

97.     Doe defendants 11 through 20 aided and abetted these breaches of fiduciary duty by Hogeg and Does 1 through 10.  Each of Does 11 through 20 was aware that the conduct of Hogeg and Does 1 through 10 alleged herein breached the fiduciary duties they owed to Perzow and knew that the purpose and effect of those acts was to benefit Hogeg and Does 1 through 10 at the expense of Perzow.  Despite that knowledge, Does 11 through 20 provided substantial assistance to Hogeg and Does 1 through 10 in carrying out their conduct.

98.     These breaches of fiduciary duty and acts of aiding and abetting breaches of fiduciary duties have proximately caused Plaintiff to be damaged in an amount to be proved at trial by, *inter alia*, depriving Perzow of his rightful equity interest in the Invest.com business, depriving Perzow of his right to participate in the management of the Invest.com business, and depriving Perzow of other rights and interests he would have received but for Defendants' conduct.

99.     Defendants' conduct in breach of the fiduciary duties owed to Plaintiff and which aided and abetted the breaches of fiduciary duties owed to Plaintiff were done with malice, oppression or fraud and with the intent to cause damage to Plaintiff, entitling Plaintiff to an award of exemplary damages.

100.     Plaintiff is accordingly entitled to an award of damages in an amount to be proved at trial, imposition of a constructive trust, exemplary damages, and other equitable relief.

## THIRD CAUSE OF ACTION

### (Fraud)

(Against All Defendants)

101.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

102.     As alleged herein, Hogeg, both on behalf of himself and on behalf of Doe defendants 1 through 10, made representations and promises that Plaintiff would receive an

- 22 -
COMPLAINT

equity interest in the Invest.com business commensurate with the value of his contribution to that business (as measured by the difference between $2.5 million and the actual value of the www.invest.com domain between more than $5 million and $16 million). He also made representations and promises that Plaintiff would have an ongoing role in the Invest.com business as one of its managers. Hogeg also made numerous representations regarding himself and his prior ventures that were knowingly untrue.

103. More than that, during the parties' discussions regarding the terms of their arrangement, Hogeg remained silent in the face of Plaintiff's unambiguous statements regarding what he understood the parties were agreeing upon. Indeed, Hogeg made numerous statements to Plaintiff which, in that context, were false and misleading without the disclosure of additional information, including that Hogeg did not intend that Plaintiff would have an equity interest or management role in the Invest.com business venture.

104. Those promises and representations were a material inducement to Plaintiff's agreement to permit Defendants to acquire the www.invest.com domain as well as Plaintiff's disclosure of his confidential plans and strategies for the Invest.com business.

105. Defendants intended that Plaintiff would rely on their representations and promises and, in fact, Plaintiff did reasonably rely on those representations and promises.

106. At the time they made the representations and promises alleged herein, Defendants did not intend to perform those promises and intended to act in a manner contrary to those representations.

107. As alleged above, Defendants, in fact, did not perform those promises and acted in a manner contrary to those representations.

108. Plaintiff has been damaged by Defendants' conduct, and his reliance on Defendants' representations and promises were a substantial factor in causing Plaintiff to suffer that harm.

109. Defendants' false promises and misrepresentations were made with malice, oppression or fraud and with the intent to cause damage to Plaintiff, entitling Plaintiff to an

1    award of exemplary damages.

2        110.    Plaintiff is accordingly entitled to an award of damages in an amount to be

3    proved at trial, exemplary damages, and other equitable relief.

4                                        **PRAYER**

5        Wherefore, Plaintiff prays for judgment against defendants as follows:

6        1.      For general and incidental damages in an amount to be determined at trial;

7        2.      For equitable relief, including imposition of a constructive trust, awarding

8    Plaintiff an equity interest in the Invest.com business commensurate with the value of his

9    contribution to that business and directing that Plaintiff be permitted to participate in the

10   management of the Invest.com;

11       3.      For exemplary damages;

12       4.      For costs of suit herein; and

13       5.      For such further relief as the Court may deem just and proper.

14                                        BOWSE LAW GROUP, A.P.C.

15   Dated:    November 9, 2018

16                                        Michael A. Bowse

17                                        HUFFINE CHUNG, A.P.C.
                                          Dustin Huffine

18

19                                        Attorneys for Plaintiff, Adam Perzow

20

21

22

23

24

25

26

27

28

- 24 -
COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury to the full extent permitted by law.

BOWSE LAW GROUP, A.P.C.

Dated:    November 9, 2018

Michael A. Bowse

HUFFINE CHUNG, A.P.C.
Dustin Huffine

Attorneys for Plaintiff, Adam Perzow

- 25 -
COMPLAINT